MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| KRISTIN LAVELLE, | ) |
| Plaintiff, | ) |
| vs. | ) Civil Action No. 22-cv-05118 |
| NATIONAL INSTITUTE OF HEALTH, | ) **COMPLAINT** |
| Defendants. | ) |

## INTRODUCTION

1.      This is an action filed under the U.S. Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et. seq*. Plaintiff Kristin Lavelle seeks an order compelling the immediate release of agency records improperly withheld by the National Institutes of Health.

## THE PARTIES

2.      Kristin Lavelle ("Plaintiff") resides in Berkeley, California. Ms. Lavelle made the FOIA request at issue in this case.

3.      Defendant NATIONAL INSTITUTES OF HEALTH ("NIH") is a component entity of the Department of the Health and Human Services, a federal agency. The NIH is subject to the Freedom of Information Act, 5 U.S.C. § 552.

## JURISDICTION AND VENUE

4.      This case is brought under 5 U.S.C. § 552(a)(4)(B) and presents a federal question conferring jurisdiction on this Court. 28 U.S.C. § 1331.

5.    Venue is proper under 5 U.S.C. § 552(a)(4)(B).

**FACTUAL BACKGROUND**

A.    **The National Toxicology Program (NTP)**

6.    The National Toxicology Program ("NTP") is a federal government entity, headquartered within the Defendant NIH at the National Institutes of Environmental Health Sciences ("NIEHS").

7.    The mission of the NTP is "to build knowledge and advance toxicological sciences to protect and promote human health." Towards this end, the NTP focuses exclusively on science, not policy.

8.    According to scientists at NTP, "For more than 35 years, the National Toxicology Program (NTP) has conducted research, testing, and analysis activities and has disseminated information about potential health hazards in our environment. As the largest government program in toxicology, NTP has studied more than 2,800 substances for a variety of health effects, developed numerous new methods and tools, and published over 600 reports and monographs."[1]

9.    The NTP studies and evaluates the toxicity of chemicals; it does not enact regulations, rules, or policies to regulate how chemicals are used in society.

B.    **Fluoride & Neurodevelopment**

10.    One of the chemicals that NTP has been studying in recent years is fluoride.

11.    Fluoride is added to the drinking water of approximately 200 million Americans. The health consequences (beneficial and/or detrimental) of this chemical are of substantial public interest given its widespread use and concomitant exposures.

12.    One of the hazards of fluoride that the NTP has been focusing on is fluoride's potential to adversely affect the developing brain, particularly when the exposure occurs *in utero* or during early infancy. Concerns about this hazard have been fueled, in part, by studies funded by the NIEHS[2] which have found significant associations between early-life fluoride exposure and IQ loss in children.

---

[1]    Xie Y, Holmgren S, Andrews DM, Wolfe MS. Evaluating the Impact of the U.S. National Toxicology Program: A Case Study on Hexavalent Chromium. *Environ Health Perspect*. 2017 Feb;125(2):181-188. doi: 10.1289/EHP21. PMID: 27483499.

[2]    Till C, et al. Fluoride exposure from infant formula and child IQ in a Canadian birth cohort. *Environ Int*. 2020, 134:4–11; Green R, et al. Association between maternal fluoride exposure during pregnancy and IQ scores in offspring in Canada. *JAMA Pediatr*. 2019, 173:940–948; Bashash M, et al: Prenatal fluoride

Continued on the next page

**C.     NTP's <u>First</u> Report on Fluoride - Neurodevelopmental Effects in Animals**

13.     In 2016, the NTP published a report titled "Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies." Consistent with the mission and function of the NTP, the report was focused solely on the science, and did not make any policy determinations.

14.     In 2018, drafts of the NTP's 2016 report were produced in discovery by the U.S. Environmental Protection Agency (EPA) in the case of *Food & Water Watch v. EPA*, No. 17-cv-02162-EMC, which is a case that is still pending before the Hon. Judge Edward Chen in the Northern District of California.[3]

15.     In *Food & Water Watch*, the EPA voluntarily produced drafts of the NTP's 2016 report in response to Plaintiffs' discovery requests, but refused to produce any drafts that contained EPA's comments, claiming such drafts were protected under the deliberative process privilege. The court rejected EPA's assertion of privilege, and ordered that the Agency produce the draft NTP reports with EPA's comments. As Magistrate Judge Kandis Westmore explained, "*whether an association exists [between fluoride and neurodevelopmental effects] is a question of scientific fact, not a policy-oriented judgment entitled to protection under the deliberative process privilege.*"[4]

**D.     NTP's <u>Second</u> Report on Fluoride - Neurodevelopmental Effects in Humans**

16.     In September 2019, the NTP publicly released a draft of its second report on fluoride, titled "Systematic Review of Fluoride Exposure and Neurodevelopmental and Cognitive Health Effects." Whereas the NTP's first report from 2016 had focused only on animal studies, this second report looked at both animal and *human* studies, with a focus on the latter. Consistent with the mission and function of the NTP, the report was focused solely on the science, and did not make any policy determinations.

17.     The 2019 draft of the NTP's second fluoride report underwent peer review by the National Academy of Sciences, Medicine & Engineering (NASEM). NASEM issued its peer review comments in

exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6-12years of age in Mexico City. *Environ Int* 2018, 121(Pt 1):658-666; Bashash M, et al: Prenatal fluoride exposure and cognitive outcomes in children at 4 and 6-12 years of age in Mexico. *Environ Health Perspect* 2017, 125(9):097017.
    [3]     The Plaintiff, Kristin Lavelle, is a plaintiff in the *Food & Water Watch* case.
    [4]     The Court's decision is attached hereto as **Exhibit A**. The relevant discussion of the draft NTP reports is on pages 6 and 7.

early 2020, and NTP thereupon released a revised report in September 2020 which incorporated NASEM's suggestions. This revised draft was again submitted to NASEM for peer review. In February 2021, NASEM publicly released its second round of peer review comments.

18.     By November of 2021, the NTP had completed a revised draft which incorporated NASEM's second round of peer review comments. In November 2021, the NTP submitted this revised draft for a third round of peer review. The NTP submitted the report to a group of 5 "external" (i.e., non-government) scientists. In January of 2022, NTP stated: "Pending general reviewer agreement with our document, we anticipate public availability of a revised final state of the science report by the end of March."

19.     By February 2022, the NTP had received comments from all 5 external peer reviewers. The NTP incorporated these comments, and, by May 2022, had completed a finalized copy of the report. After internal discussions about how to communicate the report's findings to the public (e.g., through press releases, etc), the NTP decided to publicly release the report on May 18, 2022.

20.     The NTP did not publicly release the report on May 18, 2022.

21.     The NTP has still not released the report. Instead, the NTP agreed to a request from unknown persons or parties to submit the finalized report (which had already gone through three rounds of extensive peer review) to an "inter agency review" with no set timeline for the review's completion.

**E.     Plaintiff's FOIA Request**

22.     On August 9, 2022, Plaintiff submitted a FOIA request to the Defendant NIH through its online FOIA website: https://foiaportal.nih.gov.

23.     In her FOIA request, Plaintiff asked for the following three documents:

(a) A copy of the report that NTP was going to publicly release on May 18, 2022;

(b) A copy of the report that the NTP recently circulated for inter-agency review;

(c) A copy of a December 30, 2021 email (and any attachments thereto) from a non-governmental scientist (Ibarluzea) to NTP regarding the findings of a study on fluoride and IQ in Spain. The email is cited and relied upon by NTP on a public database[5] that the NTP maintains for studies it has reviewed as part of its evaluation of fluoride.

---

[5]     *See, e.g.*, https://hawcproject.org/epi/result/9277/ and https://hawcproject.org/epi/result/9278/

24.     On August 9, 2022, a FOIA Officer at NIH emailed Plaintiff to acknowledge NIH's receipt of her request, and to incorporate a clarification that Plaintiff had requested.[6] That day, Plaintiff's FOIA request was assigned the number 58806.

25.     As of the time of this Complaint, the NIH has not made a determination, or provided any response, regarding Plaintiff's request.

26.     The NIH has not yet even begun processing Plaintiff's request. On NIH's website, the NIH lists the "status" of Plaintiff's FOIA request as "Assigned for Processing."[7] This status means the "request has been assigned to a FOIA Specialist for processing." The status category that a FOIA request is assigned when an officer begins working on the request is "In Process." A request that is "In Process" is one which is "actively being processed by the FOIA Office." Plaintiff's request has never been listed as "In Process."

27.     The NIH has not identified any "unusual circumstances" that it will face in responding to Plaintiff's request. *See* 5 U.S.C. § 552(a)(6)(B)(i).

## **LEGAL FRAMEWORK**

### A.     The Statutory Deadline for Agencies to Make a "Determination" Under the FOIA

28.     The Freedom of Information Act (FOIA) commands that federal agencies make a "determination" regarding a FOIA request within 20 working days (excluding weekends and holidays) of receiving the request. 5 U.S.C. § 552(a)(6)(A)(i).

29.     The statutory requirement that agencies make a "determination" within 20 working days is not satisfied by an agency simply acknowledging receipt of the request; nor is it satisfied by telling the requester that the agency will address the request when time permits. *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 186 (D.C. Cir. 2013) ("It is not enough that, within the relevant time period, the agency simply decide[s] to later decide. Therefore, within the relevant time period, the agency must at least inform the requester of the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions."); *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1089

---

[6] A copy of the FOIA Officer's email communications with Plaintiff are attached hereto as **Exhibit B.** The highlighted portion of the exhibit contains the specific language of Plaintiff's FOIA request.

[7] A print-out of the NIH website (taken on September 8, 2022 at 5:10 pm EST) showing the status of Plaintiff's request is attached as **Exhibit C.**

(N.D. Cal. 2015) ("A 'determination' need not be the full production of documents, but at a minimum the agency must inform the requester what documents it will produce and the exceptions it will claim in withholding documents.").

30. If a federal agency does not provide a determination within 20 working days of receiving a FOIA request, the requester has the right to seek immediate redress in federal court. *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 186-190 (D.C. Cir. 2013); *Brown v. U.S. Customs & Border Prot.*, 132 F. Supp. 3d 1170, 1172 (N.D. Cal. 2015); *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1089 (N.D. Cal. 2015).

**B.      The Deliberative Process Privilege**

31. "The purpose of the deliberative process privilege 'is to prevent injury to the quality of agency decisions' by ensuring that the 'frank discussion of *legal or policy matters*' . . . is not inhibited by public disclosure." *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1092–93 (9th Cir. 1997) (emphasis added) (citation omitted)). Accordingly, to come within the scope of the privilege the document must "'make[] recommendations or express opinions *on legal or policy* matters.'" *First Resort, Inc. v. Herrera*, 2014 WL 988773, at *5 (N.D. Cal. Mar. 10, 2014) (citation omitted).

32. Courts have held that *scientific assessments* are not deliberative unless they are part of a *policy* making procedure. Accordingly, if there is no policy being deliberated, a scientific assessment is not subject to the deliberative process privilege. *E.g.*, *Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, 279 F. Supp. 3d 121, 151 (D.D.C. 2017) ("[T]o fall under the deliberative process privilege, expert opinion must relate to an exercise of discretionary policy-making judgment."); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 198 F.R.D. 540, 544 (W.D. Wash. 2000) ("In order to be protected, expressions of expert opinion and professional judgment must relate to the exercise of policy-oriented judgment.").

33. As Magistrate Judge Kandis Westmore recently explained in *Food & Water Watch v. EPA*, 17-cv-02162-EMC, draft NTP evaluations of the scientific literature are not subject to the deliberative process privilege because they are not "predecisional" to any policy or decision.[8]

///

///

---

[8]      Exhibit A, p. 7.

COMPLAINT

## CLAIM FOR RELIEF

(Violation of the Freedom of Information Act
5 U.S.C. § 552)

34.     Plaintiff incorporates every allegation set forth above.

35.     The Freedom of Information Act does not provide federal agencies with the option to respond to FOIA requests at some indefinite point in the future, or when it is merely convenient or preferable to the agency to do so.

36.     When, as in this case, an agency fails to respond within the statutory time frame, the requester will be deemed to have exhausted her administrative remedies and may seek relief in federal court. 5 U.S.C. § 552(a)(6)(A)(i); *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 186-190 (D.C. Cir. 2013); *Brown v. U.S. Customs & Border Prot.*, 132 F. Supp. 3d 1170, 1172 (N.D. Cal. 2015); *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1089 (N.D. Cal. 2015).

37.     It has been over 20 working days since Plaintiff submitted her FOIA request.

38.     NIH has not yet provided a determination, let alone any response, to Plaintiff's request.

39.     Plaintiff's FOIA request is very limited in its scope. The request only asks for three documents, each of which are readily available to the NIH.

40.     The draft NTP report(s) at issue in this request are not protected by the deliberative process privilege, for the same reasons that the draft NTP reports were not subject to the deliberative process privilege in *Food & Water Watch v. EPA*, 17-cv-02162-EMC.

41.     The December 30, 2021 email from a *non-governmental* person to NTP, which NTP publicly cites and relies upon on its website, is not subject to any privilege under the FOIA.

42.     NIH's failure to make a determination on Plaintiff's request is a violation of the statutory deadlines set forth in the FOIA.

///

///

///

///

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Issue an order finding that the NIH has violated the FOIA;

B.    Order the NIH to immediately produce the three documents requested by Plaintiff, as authorized by 5 U.S.C. § 552(a)(4)(B);

C.    Award Plaintiff's attorneys' fees and costs as authorized by 5 U.S.C. § 552(a)(4)(E); and

D.    Grant such other relief as justice may require or that the Court may deem appropriate.


September 9, 2022                                    Respectfully submitted,


                                                     */s/ Michael Connett*
                                                     MICHAEL CONNETT
                                                     WATERS, KRAUS & PAUL
                                                     222 N. Pacific Coast Hwy
                                                     El Segundo, CA 90245
                                                     Tel: 310-414-8146
                                                     Email: mconnett@waterskraus.com
                                                     *Attorney for Plaintiff*

# Exhibit A

1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    FOOD & WATER WATCH, INC., et al.,          Case No.  17-cv-02162-EMC   (KAW)

8                     Plaintiffs,

9          v.                                    **ORDER REGARDING SECOND AND
                                                 THIRD DISCOVERY LETTERS**
10   UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY, et al.,                  Re: Dkt. Nos. 79, 81
11
                     Defendants.
12

13         Plaintiffs filed the instant lawsuit seeking judicial review of Defendant United States

14   Environmental Protection Agency's ("EPA") denial of Plaintiffs' petition to regulate the

15   fluoridation of drinking water supplies under the Toxic Substances Control Act ("TSCA").  (*See*

16   Compl., Dkt. No. 1.)  Pending before the Court are the parties' second and third discovery letters.

17   (Second Discovery Letter, Dkt. No. 79; Third Discovery Letter, Dkt. No. 81.)

18         Having reviewed the parties' filings and the relevant legal authority, the Court GRANTS

19   IN PART and DENIES IN PART Plaintiffs' request to produce documents in the second discovery

20   letter, and GRANTS Plaintiffs' request to depose the identified witnesses in the third discovery

21   letter.

22                          I.      BACKGROUND

23         Plaintiffs are non-profit organizations, associations, and individual parents who assert that

24   fluoridation chemicals in public water supplies cause a higher risk of dental fluorosis, cognitive

25   impairments, and adverse neurotoxic effects.  (Compl. ¶¶ 8-16.)  On November 22, 2016,

26   Plaintiffs petitioned the EPA to exercise its authority under the TSCA to prohibit the addition of

27   fluoridation chemicals to drinking water supplies.  (Compl. ¶ 24.)  "The TSCA requires the EPA

28   to regulate the use of certain chemical substances that pose an unreasonable risk of harm [to]

United States District Court
Northern District of California

1  health or the environment."  (Dismissal Ord. at 5, Dkt. No. 42.)

2        On February 17, 2017, the EPA denied Plaintiffs' petition.  (Compl. ¶ 25.)  The denial was

3  based primarily on the EPA's conclusion that the petition "did not set forth a scientifically

4  defensible basis to conclude that any persons have suffered neurotoxic harm as a result of

5  exposure to fluoride in the U.S. through the purposeful addition of fluoridation chemicals to

6  drinking water or otherwise from fluoride exposure in the U.S."  82 Fed. Reg. 11,878, col. 3 (Feb.

7  27, 2017) ("EPA Denial").

8        On April 18, 2017, Plaintiffs filed the instant action seeking de novo review of the EPA

9  denial.  Under the TSCA, if the petitioner is able to demonstrate by a preponderance of the

10  evidence that "the chemical substance or mixture to be subject to the proposed rule presents an

11  unreasonable risk of injury to health or the environment, without consideration of costs or other

12  nonrisk factors," then the reviewing "court shall order the Administrator to initiate the action

13  requested by the petitioner."  15 U.S.C. § 2620(4)(B).

14        The parties subsequently filed the joint discovery letters at issue.  On March 12, 2019, the

15  Court requested supplemental briefing as to the second discovery letter, as well as the production

16  of a representative sample of the documents at issue.  (Dkt. No. 90 at 2.)  On March 19, 2019,

17  Defendants filed their supplemental brief.  (Defs.' Supp., Dkt. No. 91.)  On March 21, 2019,

18  Plaintiffs filed their supplemental brief.  (Plfs.' Supp., Dkt. No. 92.)  On March 22, 2019,

19  Defendants filed objections to exhibits attached to Plaintiffs' supplemental brief.  (Defs.' Obj., Dkt.

20  No. 93.)  On March 25, 2019, Plaintiffs filed objections as well.  (Plfs.' Obj., Dkt. No. 94.)  On

21  April 3, 2019, the Court requested further documents for in camera review.  (Dkt. No. 95.)

22                        **II.    LEGAL STANDARD**

23        The Federal Rules of Civil Procedure broadly interpret relevancy, such that each party has

24  the right to the discovery of "any nonprivileged matter that is relevant to any party's claim or

25  defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).  Discovery need not

26  be admissible to be discoverable.  *Id.*  The court, however, "must limit the frequency or extent of

27  discovery otherwise allowed" if "(i) the discovery sought is unreasonably cumulative or

28  duplicative, or can be obtained from some other source that is more convenient, less burdensome,

or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).  Furthermore, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including by precluding discovery, by conditioning disclosure or discovery on specified terms, by preventing inquiry into certain matters, or by limiting the scope of discovery to certain matters.  Fed. R. Civ. P. 26(c)(1).  "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

### III.   DISCUSSION

#### A.   Discovery Letter No. 2

Discovery Letter No. 2 concerns 61 documents that Defendants are withholding based on deliberative process privilege, divided into four categories of topics.[1]  (Second Discovery Letter at 1.)  In support of the privilege, Defendants provide declarations by David P. Ross, the Assistant Administrator for the EPA's Office of Water.  (*See* Second Discovery Letter, Exhs. C ("First Ross Decl."), E ("Second Ross Decl.").)

The deliberative process privilege permits the government to withhold documents that "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  In order to qualify for the privilege, documents must be both "predecisional" and "deliberative."  *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002).  The burden is on the party asserting the privilege to show that the documents are predecisional and deliberative.  *See Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1996).

A document is "predecisional if it was prepared in order to assist an agency decisionmaker

---

[1] The Second Ross Declaration describes five categories of documents.  Prior to filing the letter, Plaintiffs removed from the dispute all of the documents related to the U.S. Public Health Service's guidance and recommendation regarding the optimal fluoride concentrations in drinking water for community water systems.  (Second Discovery Letter at 3 n.4.)

United States District Court
Northern District of California

United States District Court
Northern District of California

in arriving at his decision," and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992) (internal quotations omitted).  "Material which predates a decision chronologically, but does not contribute to that decision, is not predecisional in any meaningful sense." *Id.* at 921.  Further, an "agency must identify a specific decision to which the decision is predecisional." *Maricopa Audubon Soc'y*, 108 F.3d at 1094.  An agency, however, may not point to the potential use of information for "a decision that possibly may be made at some undisclosed time in the future." *Assembly of Cal.*, 968 F.2d at 921.

A document is "deliberative" if "disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Assembly of Cal.*, 968 F.2d at 920 (internal quotation omitted).  "Documents need not themselves be 'deliberative,' in the sense that they make nonbinding recommendations on law or policy, in order to qualify for the deliberative process privilege." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988).  Rather, even materials that are factual would "be exempt from disclosure to the extent that they reveal the mental processes of decisionmakers." *Id.*  Thus, draft documents may be deliberative if such "[m]aterials . . . allow the public to reconstruct the predecisional judgments of the administrator . . . ." *Id.* at 1122.

### i.    EPA's Six-year Review 3

The first category of documents concerns the EPA's Six-year Review 3.  (Second Ross Decl. ¶ 7.)  Under the Safe Drinking Water Act ("SDWA"), the EPA sets standards for drinking water quality.  (Second Ross Decl. ¶ 8a.)  The SDWA requires the EPA to review the existing standards not less than every six years, after which the EPA determines if revisions to the standards are necessary.  (Second Ross Decl. ¶ 8a.)

Four documents are drafts of a 2014 report, "Weight of Evidence Document for Reproduction and Developmental Health Effects, Intelligence Quotient (IQ) Health Effects in Children and Effects on the Endocrine System due to Exposure to Fluoride in Drinking Water"

("Weight of Evidence Document").  (Second Ross Decl. ¶ 8c.)  Defendants explain that the Weight of Evidence Document "was prepared to assist principal EPA decisionmakers in considering whether revisions to regulations for fluoride were needed in Six-year Review 3." (Second Ross Decl. ¶ 8c.)  Further, the drafts contained annotations and edits reflecting staff opinions, evaluations, and recommendations as to the technical analysis and evaluation of the literature being reviewed.  (Second Ross Decl. ¶ 8c.)

The Court concludes that these four documents are protected under deliberative process privilege.  The documents are predecisional because they were prepared to assist the EPA decisionmakers in deciding whether revisions to fluoride regulations were required under the SWA as part of the Six-year Review 3.  Moreover, having reviewed the representative document considered by Mr. Ross (EPA 00206505) the Court finds that the documents are deliberative, as they include numerous comments that give opinions about the conclusions made and studies reviewed and emphasize the importance of certain information, as well as edits that affect the concreteness of findings and studies being reviewed.

Plaintiffs contend that "*scientific assessments* are not deliberative unless they involve the exercise of discretionary policy-making judgment."  (Plfs.' Supp. at 1.)  The Court disagrees.  As the Ninth Circuit has recognized:

> Opinions on facts and the consequences of those facts form the grist for the policymaker's mill.  Each opinion as to which of the great constellation of facts are relevant and important and each assessment of the implications of those facts suggests a different course of action by the agency. . . . Tentative policies may undergo massive revisions based on a reassessment of these variables, during which the agency may decide that certain initial projections are not reasonable or that the likely consequences of a given course of action have been over- or underestimated.  Subjecting a policymaker to public criticism on the basis of such tentative assessments is precisely what the deliberative process privilege is intended to prevent.

*Nat'l Wildlife Fed'n*, 861 F.2d at 1120; *see also id.* at 1119 ("Where either the disclosure of the manner of selecting or presenting facts would expose the deliberative process . . . the material is exempt [from disclosure].").  In other words, *opinions* about the scientific assessments may go directly to how a decisionmaker ultimately decides an issue, as it affects how such information is

weighed in making a decision.

To the extent Plaintiffs rely on *Greenpeace v. National Marine Fisheries Service*, 198 F.R.D. 540 (W.D. Wash. 2000) for the proposition that scientific evaluation is not deliberative unless it involves the exercise of policy-oriented judgment, Plaintiffs misread *Greenpeace*. In *Greenpeace*, the district court found that the determination of jeopardy or adverse modification under the Endangered Species Act was itself not a process that implicated the government's policy-oriented judgment. 198 F.R.D. at 544. Thus, the deliberative process privilege did not apply because there was no policy decision being made; without a policy decision, the documents could not be predecisional. *Id.* at 545 ("the process itself is unrelated to any discretionary policy-making."). Because there was no policy decision at issue, the *Greenpeace* court never had to determine whether the documents themselves were deliberative.

Here, sixteen documents are staff notes and communications analyzing studies related to fluoride and its associated health effects. (Second Ross Decl. ¶ 8d.) These "documents were prepared for the purpose of making a recommendation to agency Six-year Review 3 decisionmakers in determining whether revisions to regulations for fluoride were appropriate," and "reflect opinions, evaluations, and recommendations as to the technical analysis and evaluation of the literature being reviewed." (Second Ross Decl. ¶ 8d.)

Again, the Court concludes that these documents are subject to the deliberative process privilege. Like the draft Weight of Evidence Documents, these notes and communications were prepared to assist EPA decisionmakers in deciding whether to revise fluoride regulations as part of the Six-year Review 3. Further, having reviewed the representative document considered by Mr. Ross (EPA0235568) the Court finds these documents are deliberative because they contain opinions about the quality of particular studies, and thus, how much weight should be given to those studies.

### ii.   National Toxicology Program's ("NTP") 2016 Systematic Review

The second category of documents concerns the NTP's systematic review of literature regarding neurotoxic effects of fluoride in animals. (Second Ross Decl. ¶ 10a.) The NTP selected fluoride for evaluation, and sought from EPA comments and recommendations on its preliminary

United States District Court
Northern District of California

6

1    drafts before finalizing its 2016 report.  (Second Ross Decl. ¶ 10a.)

2         In its request for supplemental briefing, the Court requested that Defendants identify the

3    specific decision to which these documents were predecisional.  (Dkt. No. 90 at 1; *see also*

4    *Maricopa Audubon Soc'y*, 108 F.3d at 1094.)  In its supplemental brief, Defendants stated that the

5    documents were "predecisional to the government's policy concerning what association, if any,

6    exists between fluoride and impairments in learning and memory, as published in the final report

7    titled *Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal*

8    *Studies* ('Animal Literature Review')."  (Defs.' Supp. at 1.)  This, however, is not a decision.

9    Whether an association exists is a question of scientific fact, not a policy-oriented judgment

10    entitled to protection under the deliberative process privilege.  *See Nat'l Wildlife Fed'n*, 861 F.2d

11    at 1117 ("To qualify . . . under the 'deliberative process' privilege, a document must be . . .

12    'predecisional' or antecedent to the adoption of agency policy") (internal quotation omitted).

13         Perhaps recognizing the lack of a policy decision, Defendants suggest that "[e]ven if the

14    Court were to find that the Animal Literature Review does not set forth a 'policy,' that finding

15    would not preclude shielding from disclosure the materials prepared to assist the NTP in reaching

16    science-based policy decisions during the process of review."  (Defs.' Supp. at 2.)  Defendants

17    point to the exercise of judgment in comparing scientific methods and inferences.  These,

18    however, are not policy decisions related to the adoption of agency policy.  Assessment of the

19    quality of scientific studies is not in and of itself a policy decision; even if decisions are required

20    in assessing such studies, those decisions do not create any identifiable policy.  *See Greenpeace*,

21    198 F.R.D. at 544 ("In order to be protected, expressions of expert opinion and professional

22    judgment must relate to the exercise of policy-oriented judgment.").  Accordingly, the Court

23    concludes that Defendants have not satisfied their burden of identifying a specific decision to

24    which the documents are predecisional.  *See Maricopa Audubon Soc'y*, 108 F.3d at 1094.

25         Therefore, the twenty-six documents identified in the Second Ross Declaration ¶¶ 10b,

26    10c, and 10d must be produced.

27         **iii.**    **NTP's Pending Systematic Review of Human Literature**

28         The third category of documents are related to the NTP's Office of Health Assessment and

United States District Court
Northern District of California

1    Translation receiving "a nomination to carry out an integrated analysis of human, animal, and

2    mechanistic evidence to develop hazard identification conclusions about whether fluoride is a

3    developmental neurotoxicant."  (Second Ross Decl. ¶ 11a.)  In general, issues nominated to the

4    NTP are usually announced in the Federal Register with a request for public comment, in

5    conjunction with an interagency comment period.  The "NTP then uses this information to decide

6    whether to move a project forward."  (Second Ross Decl. ¶ 11a.)

7           Six documents are drafts of NTP's "concept document," which proposed specific questions

8    to be addressed by the study.  (Second Ross Decl. ¶ 11b.)  The Court finds that the documents at

9    issue are predecisional.  Specifically, Defendants explain that the documents "are predecisional to

10   NTP's decision concerning the initiation of a new government program studying potential adverse

11   health effects in humans exposed to fluoride."  (Defs.' Supp. at 1.)

12          After reviewing the documents, however, the Court finds that these documents are not

13   deliberative.  Specifically, each document is a prior draft of the "Proposed NTP Evaluation on

14   Fluoride Exposure and Potential for Developmental Neurobehavioral Effects."  While the drafts

15   have some changes from the final version, the changes generally do not concern any opinions,

16   evaluations, or substantive recommendations, but are wording changes or other technical edits.

17   The changes do not reveal the priorities, opinions, or other mental processes of the authors or

18   decisionmakers.  The primary exception is the summary of the project on page 3 of each draft

19   document, which does contain changes that would expose the deliberative process.  Therefore, the

20   Court orders the production of EPA0112927 (except for page EPA0112929); EPA0112979

21   (except for page EPA0112981); EPA0120789 (except for page EPA0120791); EPA0120841

22   (except for page EPA0120843); EPA0221181 (except for page EPA0221183); and EPA0276416

23   (except for page EPA0276418).

24          Five documents are internal communications regarding how to present epidemiology data

25   to the NTP Board of Scientific Counselors for additional analysis on whether the fluoride

26   nomination should move forward.  (Second Ross Decl. ¶ 11c.)  Again, the Court finds that the

27   documents are predecisional because they were prepared to assist NTP decisionmakers on whether

28   to move the fluoride nomination forward, a policy decision.  Having reviewed EPA0112798, the

1     Court also finds that the documents are deliberative.  The communications are "related to the

2     *process* by which policies are formulated" because they contain proposals and suggestions for how

3     data should be presented and what information should be sought, thus "reflect[ing] the personal

4     opinions of the writer rather than the policy of the agency . . . ."  *Nat'l Wildlife Fed'n*, 861 F.2d at

5     1118-19 (internal quotation omitted).  Thus, the deliberative process privilege applies.[2]

6                    **iv.    Nominations for the NTP's 2016 Report on Carcinogens**

7             The last category of documents concern the NTP's request for recommendations from the

8     EPA to determine whether fluoride should be considered for review in the 2016 Report on

9     Carcinogens and for evaluation of non-cancer health outcomes by the Office of Health Assessment

10    and Translation.  (Second Ross Decl. ¶ 12a.)  The four documents at issue are communications

11    regarding whether the EPA should offer support for devoting governmental resources to a fluoride

12    review.  (Second Ross Decl. ¶ 12b.)  The Court finds that these documents are predecisional

13    because they go to the policy decision of whether the EPA would recommend that fluoride should

14    be considered in the Report on Carcinogens.  The Court also finds, after review of the

15    representative document considered by Mr. Ross (EPA0151822), that the documents are

16    deliberative because they contain the personal opinions of the authors on whether there was

17    sufficient information or data to warrant adding fluoride to the NTP's health evaluation.

18    Accordingly, the deliberative process privilege applies.

19                    **v.    Protective Order**

20            As explained above, the Court orders Defendants to produce the twenty-six documents

21    identified in the Second Ross Decl. ¶¶ 10b, 10c, and 10d, as well as the six documents identified

22    in the Second Ross Decl. ¶ 11b, with the exception of the summary on page 3 of each of the

23    documents.  Defendants request that in the event of production, the Court issue a protective order

24    prohibiting Plaintiffs from publicly releasing or using the documents for purposes other than

25    _____

26    [2] In their supplemental brief, Plaintiffs for the first time argue that EPA's arguments are
      inconsistent with other disclosures made in the case.  (Plfs.' Supp. at 4-5.)  Plaintiffs' arguments
27    are improper, as the supplemental briefing was limited to what specific policy decision were the
      documents identified in the Second Ross Declaration ¶¶ 10-11 related.  (*See* Dkt. No. 90 at 1-2.)
28    In any case, the specific documents discussed by Plaintiffs are not covered by deliberative process
      privilege, for the reasons stated in this order.

United States District Court
Northern District of California

1    litigation.  (Defs.' Supp. at 5.)

2        Federal Rule of Civil Procedure 26(c) permits a court to, "for good cause, issue an order to

3    protect a party or person from annoyance, embarrassment, oppression, or undue burden or

4    expense . . . ."  "A party seeking good cause bears the burden, for each particular document it

5    seeks to protect, of showing that specific prejudice or harm will result if no protective order is

6    granted."  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (internal

7    quotation omitted); *see also Beckman Inds. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)

8    ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not

9    satisfy the Rule 26(c) test." (internal quotation omitted)).

10       Here, Defendants argue that Plaintiff Fluoride Action Network ("FAN") could release the

11   information "to embarrass EPA staff and mislead the public regarding the health risks associated

12   with fluoride in such a way as to discourage candid discussion within and among government

13   agencies."  (Defs.' Supp. at 5.)  Such arguments are speculative, and Defendants provide no

14   specific reasons why the staff opinion could create embarrassment or harm to the public.

15   Accordingly, the Court finds that Defendants have not satisfied their burden of showing the

16   specific prejudice or harm that will result, and denies the request for a protective order.

### B.    Third Discovery Letter

18       Discovery Letter No. 3 concerns the depositions of three EPA employees: Kristina Thayer,

19   Paul Price, and Joyce Donohue.  (Third Discovery Letter at 2-3.)  Defendants object that the

20   depositions are duplicative and burdensome, irrelevant, and may involve testimony that is

21   protected by the deliberative process privilege.  (*Id.* at 1-2.)  The Court disagrees.

22       First, Defendants argue that the depositions are duplicative and burdensome because

23   Plaintiffs have already deposed EPA witnesses on the scientific bases for the EPA's regulation of

24   fluoride under the SDWA.  (Third Discovery Letter at 1.)  Plaintiffs, however, explain that they do

25   not intend to ask the witnesses about those issues.  Specifically, Plaintiffs state they will ask Ms.

26   Thayer about the NTP study she authored, and how the EPA establishes the safe dose for

27   neurotoxicants like fluoride.  (*Id.* at 2-3.)  Plaintiffs further state that they will ask Mr. Price about

28   the basis for his personal concerns about his disagreements with the EPA's standard.  (*Id.* at 3.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Finally, Plaintiffs state they will ask Ms. Donohue about the EPA's 2010 risk assessment on

2    fluoride, as well as other recent EPA-funded studies regarding neurological effects from prenatal

3    fluoride exposure.  (*Id.*)  These topics do not overlap with prior testimony regarding the EPA's

4    regulation of fluoride under the SDWA.

5         Second, Defendants contend that the factual and legal validity of the EPA's regulation of

6    fluoride under the SDWA is not at issue in this litigation because the instant case concerns the

7    EPA's authority under the TSCA to regulate or ban fluoridation of water supplies.  (Third

8    Discovery Letter at 1-2.)  Thus, the merits of the EPA's existing regulations under the SDWA is

9    not relevant.  (*Id.* at 2.)  The Court disagrees.  The SDWA concerns goals and standards for

10   drinking water quality, which according to Defendants, requires an evaluation of the risks of

11   contaminants including fluoride.  (*Id.* at 1 nn.2, 3.)  The instant suit, in comparison, requires that

12   the presiding judge make findings on "whether the ingestion of fluoride in drinking water causes

13   neurotoxic harm." (Dkt. No. 68 at 1.)  Although the SDWA is a different statutory scheme from

14   the TSCA, both concern the potential risks caused by fluoride in drinking water, and therefore can

15   inform the ultimate inquiry of this case.

16        Finally, to the extent Defendants assert deliberative process privilege, such objections are

17   premature.  Moreover, it is not clear that asking these witnesses about their opinions years *after*

18   the decisions at issue have been made would raise the deliberative process privilege, as they would

19   not be predecisional.  *See Assembly of Cal.*, 968 F.2d at 920 ("documents deemed 'postdecisional'

20   do not enjoy the protection of the deliberative process privilege.").

21        Accordingly, the Court ORDERS Defendants to produce Ms. Thayer, Mr. Price, and Ms.

22   Donohue for deposition.

23        ///

24        ///

25        ///

26        ///

27        ///

28        ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## IV.    CONCLUSION

For the reasons stated above, the Court ORDERS Defendants to produce: (1) the twenty-six documents identified in the Second Ross Declaration ¶¶ 10b, 10c, and 10d; and (2) the six documents identified in the Second Ross Declaration ¶ 11b, except for the summary on page 3 of each of the documents.  The Court also orders Defendants to produce Ms. Thayer, Mr. Price, and Ms. Donohue for deposition.

IT IS SO ORDERED.

Dated: April 12, 2019

_____
KANDIS A. WESTMORE
United States Magistrate Judge

**Exhibit B**

## RE: [EXTERNAL] Re: NIH FOIA - Assignment Notification from NIH FOIA Public Portal-Tracking # 58806

From:   NIEHS FOIA Office (niehsfoia@niehs.nih.gov)

To:     kristie█████████████████

Cc:     niehsfoia@niehs.nih.gov

Date:   Wednesday, August 10, 2022 at 04:36 AM PDT

You're welcome Kristin and thank you for the confirmation. We appreciate it.

Very Respectfully,

Tony Livingston

984-287-4478

---

**From:** Kristie Lavelle █████████████████
**Sent:** Tuesday, August 9, 2022 6:00 PM
**To:** NIEHS FOIA Office <niehsfoia@niehs.nih.gov>
**Subject:** [EXTERNAL] Re: NIH FOIA - Assignment Notification from NIH FOIA Public Portal-Tracking # 58806

Hello Tony,

Thank you for clarifying. Confirming that the revised date range is correct and you can withdraw Request No. 58810.

Best regards,

Kristin Lavelle

Sent from Yahoo Mail for iPhone

On Tuesday, August 9, 2022, 12:45 PM, NIEHS FOIA Office <niehsfoia@niehs.nih.gov> wrote:

Hey Kristin,

Hope all is well.

We received your FOIA Requests 58806 and 58810. We updated your request for 58806 to clarify the date range for the documents you seek to start on December 30, 2021 and not May 1, 2022 (*Date Range for Record Search: From 12/30/2021 To 08/09/2022*).  With that being said can you reply to this email confirm this information? Also, can you confirm for us that we can withdraw your request 58810 and use 58806 as your request to provide you with the responsive records?

Very Respectfully,

Tony Livingston

984-287-4478

---

**From:** FOIA_noreply@nih.gov <FOIA_noreply@nih.gov>
**Sent:** Tuesday, August 9, 2022 11:02 AM
**To:** NIEHS FOIA Office <niehsfoia@niehs.nih.gov>
**Subject:** NIH FOIA - Assignment Notification from NIH FOIA Public Portal-Tracking # 58806

*Hi FOIA Team!*

*Request # 58806 was submitted through the NIH FOIA Public Portal and assigned to you for review and further processing.*

*Please review the request and if all required details have not been provided by the requester, be sure to use the "Stop Clock" option to ensure processing time for the request is accurately monitored while waiting for clarification/information from the requester.*

*Request Description:*

*I am requesting the following documents related to the National Toxicology Program's (NTP) systematic review on fluoride neurotoxicity:*

*(1) The copy of the NTP report that was scheduled to be publicly released on May 18, 2022. (Upon information and belief, a copy of this report will be available in emails from NTP personnel during the week of May 9, 2022.)*

*(2) The copy of the NTP report that the NTP recently circulated for inter-agency review. Upon information and belief, this report was circulated for inter-agency review in May, June, July or August of 2022.*

*(3) The December 30, 2021 email(s), and attachments thereto, from Ibarluzea to the NTP that are referenced on the following webpages:* https://hawcproject.org/epi/result/9277/ *and* https://hawcproject.org/epi/result/9278/ *(Date Range for Record Search: From 12/30/2021 To 08/09/2022)*

*Hi FOIA Team!*

*Request # 58810 was submitted through the NIH FOIA Public Portal and assigned to you for review and further processing.*

*Please review the request and if all required details have not been provided by the requester, be sure to use the "Stop Clock" option to ensure processing time for the request is accurately monitored while waiting for clarification/information from the requester.*

***Request Description:***

*I am writing to clarify the request I submitted this morning (Request No. 58806). One of the documents I requested is an email(s) from a non-governmental employee (Ibarluzea) dated December 30, 2021. So the date range for the documents I am requesting starts on December 30, 2021, not May 1, 2022 as I had indicated in the "Date Range for Record Search" box. I would appreciate if this correction/clarification could be made to my request. Thank you. (Date Range for Record Search: From 12/30/2021 To 08/09/2022)*

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

**Exhibit C**

## Request - 58806                                                          ← Back

### Requester Details

To modify request details please update your requester profile or contact the our office for assistance.

**Kristin Lavelle**

Requester Default Category: Others

### Request Details

| | |
|---|---|
| Date Requested | 08/09/2022 |
| Status | Assigned for Processing |

### General Information
Please select the NIH Institute or Center where your request should be directed. **If you are uncertain, select OD.**

| | |
|---|---|
| Institute or Center | NIEHS ⬍ |
| Institute or Center Name | NIEHS |
| Request Type | FOIA ⬍ |
| Requester Category | Others ⬍ |

### Request Information

| | |
|---|---|
| Description | I am requesting the following documents related to the National Toxicology Program's (NTP) systematic review on fluoride neurotoxicity: |
| Date Range for Record Search: From(mm/dd/yyyy) | 12/30/2021 To (mm/dd/yyyy) 08/09/2022 |
| Description Document | 🔗 Add Attachment |

### Fee Information
**See our fee schedule,** here.

Willing to Pay All Fees            ☑

Willing Amount ($)                 25.00

We generally assume that when you request records you are willing to pay the fees we charge for services associated with your request. You may specify a limit on the amount you are willing to spend. We will notify you if it appears that the fees will exceed $25.00 or your specified limit and ask whether you nevertheless want us to proceed with the search. We do not send an invoice to requesters if assessable processing fees are less than $25.00. 5 U.S.C. 552 (a) and (h).

Fee waiver required criteria.

Fee Waiver Requested              ☐ 🖉 Add Attachment

Fee Waiver Request Reason

**Cost Details :**

Total Cost              $0.00

Cost Incurred           $0.00

Amount Paid             $0.00

Balance Amount          $0.00

Payment Status          No Charges

**Expedite Information**
Criteria for Expedited Processing:

1) A detailed statement, certified to be true and correct, explaining how a failure to obtain requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

2) A detailed statement, certified to be true and correct, explaining how there is an urgent need to inform the public about an actual or alleged Federal Government activity (this criterion applies only to those requests made by a person primarily engaged in disseminating information to the public).

Please note that the above standards are intended to be narrowly applied, and requests that do not meet the criteria for expedited processing may extend processing times.

Expedite Requested              ☐ 🖉 Add Attachment

Expedite Reason

Freedom of Information Act    |    No Fear Act    |    HHS Vulnerability Disclosure    |    Office of Inspector General    |    USA.gov – Government Made Easy

NIH...Turning Discovery Into Health®

National Institutes of Health, 9000 Rockville Pike, Bethesda, Maryland 20892

U.S. Department of Health and Human Services